J-S17043-21

2021 PA Super 137

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 240 MDA 2021 |

Appeal from the Decree Entered January 21, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2020-0126

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.M, MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 253 MDA 2021 |

Appeal from the Order Entered January 21, 2021
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000119-2018


BEFORE:  STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                    **FILED JULY 01, 2021**

N.M. (Mother) appeals from the January 21, 2021 orders[1] of the Court

of Common Pleas of York County (trial court) changing the permanency goal

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court issued separate orders changing the goal and terminating Mother's parental rights.  The orders were dated January 20, 2021, and
*(Footnote Continued Next Page)*

from reunification to adoption and terminating her parental rights to A.M. (Child). We affirm.

**I.**

We glean the following facts from the certified record. In November 2017, the York County Office of Children, Youth & Families (CYF) received a referral alleging that Mother was abusing drugs and could not properly care for Child. Child was removed from Mother's care pursuant to a safety plan and initially placed with maternal grandmother. In December 2017, maternal grandmother told CYF that she could no longer care for Child and Mother did not have stable housing. In April 2018, Child was adjudicated dependent and was placed in foster care where he has remained since. On July 30, 2020, CYF filed petitions to change the court-ordered goal from reunification to adoption and to terminate Mother's parental rights. A hearing on the petitions was held on January 20, 2021, and the prior record and proceedings from the dependency action were incorporated into the record.

CYF first presented testimony from Linda Tirado-Lopez (Tirado-Lopez), a drug and alcohol monitoring specialist from the Families United Network (FUN). FUN performs random drug and alcohol testing for CYF and was open for services for Mother between November 1, 2017, and October 23, 2020.

---

docketed the next day. Mother filed separate notices of appeal from each order and we consolidated her appeals *sua sponte*. **See** Pa. R.A.P. 513.

Tirado-Lopez testified that during that time, Mother tested positive once for THC and oxycodone, three times for THC, and once for oxycodone, opiates, THC and cocaine. She had an additional positive test where the report did not indicate what substance she had tested positive for. Mother's last drug and alcohol test occurred on June 6, 2018. Mother was supposed to be tested once a week but she was unavailable to be tested on 24 occasions and there were two occasions when she refused to provide a sample. FUN stopped the tests in June 2018 because Mother was discharged from services at Justice Works for non-compliance and her testing had previously been conducted during her visits there.

FUN attempted to contact Mother to continue testing in 2018 but then was notified by CYF to stop testing because she was no longer in contact with the agency. For a few months in 2018, Mother's whereabouts were unknown and in December of that year she was charged with aggravated assault. She was subsequently arrested and was released from jail in August 2019. FUN did not attempt any further contact for testing following Mother's release. FUN was scheduled to test Mother at a status hearing in October 2020 but she did not attend that hearing and FUN closed her case.

Next, Samuel Richard (Richard), Mother's caseworker at CYF, testified that Child had been adjudicated dependent on April 20, 2018. Since that time, CYF had drafted and provided Mother with eight Family Services Plans (FSPs) outlining goals for her to work toward before reunification with Child. The

primary goals had remained consistent throughout those plans and that Mother had never objected to any of the outlined goals. Richard testified that the most important goals were drug and alcohol testing and treatment and cooperation with an in-home team to improve parenting skills. Additional goals included maintaining communication with CYF, obtaining stable housing and income, undergoing a mental health assessment and attending Child's medical and educational appointments. Richard testified that based on reports from her probation officer, Mother had made some progress in the six to seven months prior to the hearing.

However, Mother was not in contact with CYF for several lengthy periods of time while the case was pending. Mother did not update CYF regarding her contact information throughout the pendency of the case, and when her whereabouts were unknown, CYF was only able to locate her through collateral information. She had no contact with CYF between June 2018 and May 2019 when CYF located her in the county jail. When she was released in August 2019, she cooperated with some services and visited with Child for approximately four months. She refused to work with an in-home team during that time, saying it was too much for her to handle. Richard testified that at the February 2020 status hearing, Mother "essentially indicated … that she was done pursing visitation and reunification at that time." Notes of Testimony, 1/20/21, at 26. CYF then had no contact with her until October

2020 when it contacted her through her probation officer. CYF filed the instant petitions in July 2020.

When CYF reestablished contact in October 2020, Mother had made progress with drug and alcohol treatment. She had obtained a one-bedroom apartment that she shared with her paramour and their infant child. Richard testified that the apartment would not be appropriate for Child given the size and family members. Richard testified that the primary issue in the case was that Mother was inconsistent with visiting Child and maintaining their relationship, and that she had not engaged with services that would have helped her build parenting skills. She had obtained a mental health evaluation in January 2020, but the trial court rejected that evaluation at that time and ordered her to pursue a more comprehensive evaluation.

Richard testified that Mother receives disability payments and had recently obtained a job as a home health aide. Prior to that position she had not been employed during the pendency of the case. He testified that CYF had not limited Mother's ability to visit with Child at any time. In 2020, she only visited Child twice, both times in December. In 2019, she visited with Child eleven times from September through December. From April to May of 2018, she attended nine of twelve scheduled visits through Justice Works. She did not visit Child between June 2018 and September 2019. Richard did not know of any times Mother saw Child outside of scheduled visits and said that she did not maintain regular phone, mail or social media contact with

Child. He said that there were no services requested by Mother that CYF refused to provide. Mother had not provided Child with any gifts or cards outside of her scheduled visits and had not attended any of Child's medical appointments or school functions. She did not contact CYF for information regarding Child's school, medical issues or therapy. She did not perform any parental functions outside of the 22 visits over the course of the dependency.

Richard also visited and observed Child's interactions with his foster parents once a month. He testified that Child was "very much at home in that home," trusted his foster parents, viewed them as his primary caregivers and generally had a positive relationship with them. *Id.* at 33. He refers to his foster parents as "grandma and grandpa." *Id.* Richard said he could not describe the bond between Mother and Child other than to say that Child enjoyed his visits with Mother in December 2020. He also had a loving relationship and positive visits with Mother in 2019. Child did show defiant behavior, lying, disrespect and confusion after the visits in 2019 and 2020 which Richard attributed to the long periods of Mother's absence from his life.

Richard testified that he believed it was in Child's best interest to change the goal from reunification to adoption to provide Child with a stable and permanent home. He recognized that Mother had made some progress but it was not sustained or consistent, and at the time of the hearing, Mother was still not able to take custody of Child. Child had been dependent for 33 months and was thriving in his foster environment. He was 12 years old, in fifth grade

and had consistently attended therapy. While he had some behavioral issues that were addressed in therapy, he had improved behaviorally and academically while in placement. During the periods of time when Mother was absent, Child's behavior improved and he matured. However, behavioral issues such as defiance, lying, disrespect and occasional aggression toward other children resumed after his visits with Mother. Richard believed that termination of Mother's parental rights was in Child's best interests because he struggled with "being in limbo in regard to permanency." *Id.* at 43. He testified that the foster parents were able to adopt Child.

On cross-examination, Richard testified that he did have current contact information for Mother but said that he had to find her and ask her for that information. She cooperated with unannounced in-home visits when she was present for them, but CYF could not conduct those visits during the periods when it did not have her current address. He said after her release from jail, she was drug tested through the probation office. From April 2020 onward, Mother had negative drug screens.

Richard said that Mother decided to cease visitation with Child in February 2020 after learning that the visits had a negative effect on Child. At that point, Mother had not visited Child for two months. After that hearing, CYF lost contact with Mother and did not locate her again until October 2020. Mother had not provided CYF with a current phone number and Richard was only able to contact her after getting her contact information from her

probation officer. During that time, Richard made one unannounced visit to the address on file but did not make contact. CYF did not inform Mother of any of Child's medical appointments or school meetings after her release from jail in August 2019.

Mother testified on her own behalf at the hearing. She said that she moved into her current apartment in March 2020 and that she gave CYF her new address between two weeks to three months after she moved in. She lived with her daughter and paramour.[2] She was employed as a home care attendant for her mother and helped with cleaning, chores, shopping and anything else she would need during the day. She would be making $13.99 per hour for up to 32 hours per week. She said that she was currently on probation after pleading guilty to simple assault and would complete her sentence some time in 2021.

Mother admitted that she had substance abuse issues in the past and testified that she began counseling in April 2020 to address her addiction. She said that she also has a mental health counselor and she was addressing mental health issues she had been experiencing since she was young. She was drug tested twice a month through her counseling program and had not tested positive since she began treatment.

---

[2] Her daughter was born in October 2019.

Prior to her incarceration, Mother was unsuccessfully discharged from services with the Justice Works program. She said that she could not work with her Justice Works team after she moved to a new residence but that she did not ask to be reassigned to a new team. She declined to work with a different in-home services team after her release because they were pushing her to deal with issues such as income, addiction and housing very quickly.

Mother said that she decided to stop visiting with Child because she was told that he had behavioral issues after their visits. She said that the foster parents were able to help him in ways that she could not and that she stopped visits to allow him to succeed. She did not believe termination of her parental rights was in Child's best interests and she did not want to lose her parental rights because she still loved Child. She acknowledged that the foster family could support him more and that he was achieving more than he would have been able to in her care.

At the conclusion of the hearing, Child's guardian *ad litem* (GAL) stated that she supported the petition to terminate Mother's parental rights and that Child views his current placement as his home and does not want to leave. Child's legal counsel also supported the petition and stated that Child wanted to remain with his foster family but have contact with Mother. The trial court granted the petitions to change the permanency goal to adoption and terminate Mother's parental rights and Mother filed timely notices of appeal. Mother and the trial court have complied with Pa.R.A.P. 1925.

**II.**

On appeal, Mother argues that the trial court abused its discretion in changing the goal from reunification to adoption and terminating her parental rights.[3]  We disagree.

**A.**

For ease of disposition, we begin with Mother's second question on appeal.  Mother argues that CYF did not provide clear and convincing evidence in support of termination under 23 Pa.C.S. § 2511(a)(1) & (8) and in finding that termination would be in Child's best interest under 23 Pa.C.S. § 2511(b).  "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [the subsections of 23 Pa.C.S. § 2511(a)]."  **In re Adoption of J.N.M.,** 177 A.3d 937, 942 (Pa. Super. 2018) (quoting **In re L.M**., 923 A.2d 505, 511 (Pa. Super. 2007)).  Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come

---

[3] We review the trial court's decision for an abuse of discretion.  **In re G.M.S.**, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted).  Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings."  **In re Interest of D.F.,** 165 A.3d 960, 966 (Pa. Super. 2017).  "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence."  **In re S.H.**, 879 A.2d 802, 805 (Pa. Super. 2005).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."  **In re A.S.**, 11 A.3d 473, 477 (Pa. Super. 2010).  "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result."  **Id.**

- 10 -

to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re D.L.B.*, 166 A.3d 322, 326 (Pa. Super. 2017) (citation and quotation marks omitted). The court may then enter a final decree of involuntary termination if it is in the child's best interests as outlined in Section 2511(b). *Id.*

The trial court found clear and convincing evidence to terminate Mother's parental rights pursuant to subsections 2511(a)(1) and (8). When reviewing a trial court's order terminating parental rights, we need only agree as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm the order. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we proceed to our analysis of the trial court's findings under subsection 2511(a)(1). Termination is proper under that subsection if

> [t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

"With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." *See* 23 Pa.C.S. § 2511(b). Finally, "where a child is in foster care, a parent has the affirmative duty to work towards the return of the child by cooperating with the Agency to obtain the

rehabilitative services necessary for her to be capable of performing her parental duties and responsibilities." **T.M.W.**, **supra**, at 949.

Here, it is undisputed that Child had been living with his foster parents for 33 months at the time of the hearing. Child was adjudicated dependent in April 2018 and CYF filed the petition to terminate Mother's parental rights in July 2020. Prior to the filing of the petition, Mother's most recent visits with Child were in December 2019. At a status hearing in February 2020, she told CYF that she would stop visiting Child because the visits were causing behavioral issues. Richard testified that Mother had no contact with CYF from February until October 2020. Mother agreed with this timeline, testifying that she elected not to continue visits with Child after the February 2020 status hearing when she learned that the visits were having a negative effect on Child. While Mother was receiving treatment for her substance abuse issues during this time period, she did not keep in contact with CYF or participate in any in-home services aimed at improving her parenting skills, as was required in her FSP. She was previously discharged unsuccessfully from such services with Justice Works and declined to continue to work with services after her release from jail. During the pendency of the case, she did not attend any medical, dental or educational appointments with Child.

The record evinces clear and convincing evidence in support of termination based on Mother's failure to perform any parental duties or

communicate with CYF in any way in the six months prior to the filing of the

petition. As the trial court recognized,

> The [c]ourt notes that being a parent is an affirmative responsibility. ***In re: B.N.M.***, 8[56] A.2d 847, 855 (Pa. Super. 2004), the Court noted: "Parental duties require that the parent act affirmatively with good faith interest and effort and not yield to every problem in order to maintain the parent/child relationship to the best of his ability, even in difficult circumstances. The parent must utilize all available resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent/child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs." In essence, that sums up this case.
>
> The [c]ourt does appreciate that mother has had substantial obstacles to overcome. She has noted that she struggled with some mental health issues since an early age. Apparently there were some difficulties working with the team while she was required to live in her mother's home due to her other circumstances. Nonetheless, she was not able to successfully complete addressing all of the needs that she would need to address for reunification to occur currently.
>
> It also is notable in this case that at many times the agency had to reach out and find her, rather than the other way around. The [c]ourt did not hear that she was asking when medical appointments were occurring or that she was asking and affirmatively pursuing the services that could have helped to move her forward faster.

Order, 1/20/21, at 5-6. The record supports the trial court's factual findings

and conclusions of law. Therefore, we conclude that the termination of

Mother's parental rights was justified under Section 2511(a)(1).

The next step of our inquiry is whether the termination is in the best

interests of Child. There are several factors to consider in this analysis:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. . . . While a parent's emotional bond with his or her child is a major aspect of . . . [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015); *In re M.Z.T.M.W.*, 163 A.3d 462, 464 (Pa. Super. 2017).  It is sufficient for the court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).  "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.*

Moreover, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted).  The court may consider intangibles such as the love, comfort, security and stability the child might have with the foster parent.  *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).  Ultimately, the concern is the needs and welfare of the child.  *In re Z.P.*, *supra* at 1121.

The record supports the trial court's conclusion that termination of Mother's parental rights would serve Child's best interests.  Child had been in

placement with his foster parents for nearly three years. He had formed a strong bond with his foster parents and referred to them as "grandma and grandpa." He viewed their home as his own and expressed that he wanted to stay with them. In addition, Child would consistently exhibit behavioral issues following his visits with Mother. Richard testified that while Child had a loving relationship with Mother during their visits, the infrequent nature of the visits and the long periods of time when he did not see Mother at all made it difficult to determine whether Child had any bond to Mother. In the times that he did not see Mother regularly, he thrived in school and at home. His foster parents ensured that he attended therapy and he matured well under their care. Based on this evidence, the trial court did not abuse its discretion in holding that terminating Mother's parental rights was in Child's best interests.

**B.**

Next, Mother argues that the trial court abused its discretion in changing the goal of the dependency proceedings from reunification to adoption. Because we have concluded that the trial court did not abuse its discretion in granting the petition to terminate Mother's parental rights, this issue is moot. *In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) ("[T]he effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption.") (citing *Interest of D.R.W.*, 227 A.3d 905, 917 (Pa. Super.

2020)). Accordingly, we affirm the order changing the permanency goal from reunification to adoption.

Even if we were to reach the merits of this issue, we would conclude that no relief is due. The purpose of the Juvenile Act is to "preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1). The Act is additionally intended to "prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006). As a result, "[a]n agency is also not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. However, an agency must redirect its efforts towards placing the child in an adoptive home only after the child welfare agency **has made reasonable efforts** to return a foster child to his or her biological parent, but those efforts have failed[.]" *In the Interest of T.M.W.*, 232 A.3d 937, 947 (Pa. Super. 2020) (cleaned up, emphasis in original).

When deciding whether to change the permanency goal in a dependency action, the trial court must consider, *inter alia*:

> (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has

been in placement for at least fifteen of the last twenty-two months.

*In Interest of L.T.*, 158 A.3d 1266, 1277 (Pa. Super. 2017) (citation omitted).  Additionally, a court is required to provide compelling reasons why it is not in the best interest of the child to return to his or her parents and to instead be placed for adoption.  42 Pa.C.S. § 6351 (f.1)(5)(iv)(C).  The child's best interest, safety, permanency and well-being must take precedence over all other considerations in a goal change proceeding.  *In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010).  The parent's rights are secondary and a goal change to adoption may be appropriate, even under circumstances where a parent substantially complies with a reunification plan.  *Id.*  A court cannot subordinate a child's need for permanence and stability to a parent's claim of progress and goals for the future.  *Id.*

Here, Child was adjudicated dependent in April 2018.  Over the pendency of the case, CYF developed eight FSPs for Mother with the goals of addressing her substance abuse issues and developing parenting skills through work with in-home services.  Mother was also required to maintain communication with CYF, obtain stable housing and income, undergo a mental health assessment and attend Child's medical and educational appointments.  Mother began treatment for her addiction in April 2020 and continued through the time of the hearing in this matter.  She also obtained a one-bedroom apartment but acknowledged that it would not be appropriate housing for Child as she already lived with her paramour and infant daughter.  She was

newly employed at the time of the termination hearing. She admitted at the hearing that she was not able to take custody of Child at that time but said that she wanted to continue to work toward reunification. CYF attempted to provide in-home services to Mother but was unable to do so because she failed to keep in contact with the agency. She did not make progress on her goal of developing parenting skills through working with in-home services, as she had been unsuccessfully discharged from one program and elected to stop working with another.

At the time of the hearing, Child had been in foster care for nearly three years. His foster parents had helped him improve his progress in school and had ensured that he attended regular therapy. He had bonded with his foster parents and the trial court had found at prior status hearings that he was thriving in their care. Finally, Child expressed that he wanted to remain with his foster parents. The record supports the trial court's decision to change the permanency goal to adoption, despite CYF's reasonable efforts that Mother did not make significant progress on her reunification goals and remaining with his foster parents was in Child's best interests. No relief is due.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/01/2021