**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.F.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1093 EDA 2022 |

Appeal from the Decree Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001899-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: K.F.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1094 EDA 2022 |

Appeal from the Order Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000316-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.I.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1101 EDA 2022 |

Appeal from the Decree Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002632-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: M.I.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S30031-22

APPEAL OF: D.C., FATHER                  :
                                          :
                                          :
                                          :
                                          :
                                          :
                                          :    No. 1102 EDA 2022

Appeal from the Order Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000466-2020

IN THE INTEREST OF: J.H.C., A            :    IN THE SUPERIOR COURT OF
MINOR                                     :        PENNSYLVANIA
                                          :
                                          :
APPEAL OF: D.C., FATHER                  :
                                          :
                                          :
                                          :
                                          :    No. 1103 EDA 2022

Appeal from the Decree Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001227-2018

IN THE INTEREST OF: J.H.C., A            :    IN THE SUPERIOR COURT OF
MINOR                                     :        PENNSYLVANIA
                                          :
                                          :
APPEAL OF: D.C., FATHER                  :
                                          :
                                          :
                                          :
                                          :    No. 1104 EDA 2022

Appeal from the Order Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000465-2020

IN THE INTEREST OF: D.G.C., A            :    IN THE SUPERIOR COURT OF
MINOR                                     :        PENNSYLVANIA
                                          :
                                          :
APPEAL OF: D.C., FATHER                  :
                                          :

- 2 -

J-S30031-22

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 1105 EDA 2022</td></tr>
</table>

Appeal from the Decree Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001396-2019

<table>
<tr><td>IN THE INTEREST OF: D.G.C., A MINOR</td><td>:</td><td>IN THE SUPERIOR COURT OF PENNSYLVANIA</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>APPEAL OF: D.C., FATHER</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 1106 EDA 2022</td></tr>
</table>

Appeal from the Order Entered March 29, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000315-2021

BEFORE:   STABILE, J., McCAFFERY, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:          **FILED OCTOBER 12, 2022**

In these consolidated cases, D.C. (Father) appeals from the decrees entered in the Court of Common Pleas of Philadelphia County Juvenile Division (juvenile court) involuntarily terminating his parental rights to four of his children: M.C., born in April 2014; J.C., born in May 2016; K.C. born in August 2018; and D.C. born in August 2019 (collectively, Children) as well as the orders changing the permanency goal of Children to adoption. Father claims that termination of his parental rights constitutes an abuse of discretion

_____

* Retired Senior Judge assigned to the Superior Court.

- 3 -

because he has substantially complied with all of his case objectives and shares a strong parent-child bond with Children. We affirm.[1]

**I.**

The relevant facts and procedural history of this case are as follows. Because of reports of truancy, the Philadelphia Department of Human Services (DHS) has been involved with the family since the fall of 2015. Concerns grew to include inappropriate housing conditions, Parents' drug use and their mental health issues. M.C. and J.C. came into care in June 2018 and K.C. and D.C. were put into placement in August 2019, when Mother and Father tested positive for cocaine upon D.C.'s (child's) birth. DHS filed petitions seeking termination of Parents' parental rights to Children in December 2020 and June 2021.

At the March 29, 2022 hearing, it was stipulated that William Russell, Ph.D., was qualified as an expert in the area of parental capacity. Dr. Russell conducted parental capacity evaluations of Parents in January 2019 because of reports of truancy, injuries to the Children, sexual abuse allegations and inappropriate housing conditions. Dr. Russell testified that Father receives social security disability income of $800 per month and Parents were residing with paternal grandmother in her three-bedroom home at the time of the

_____

[1] The parental rights of T.G. (Mother) to Children were also involuntarily terminated. She has not filed an appeal. Mother and Father (collectively, Parents) have eight children together, none of whom are in their care.

- 4 -

evaluation. Both Parents have been diagnosed with bipolar disorder and Dr. Russell opined that long-term treatment would be necessary for Father because "he was already receiving medication and treatment [and] the psychiatrist who evaluated him noted the ongoing presence of mania, hallucinations[.]" (N.T. Hearing, 3/29/22, at 33).

Dr. Russell also noted that although Father acknowledged during the evaluation that the family's living situation was unsuitable for his eight children, he nonetheless took no steps to change these circumstances. In light of the sexual abuse allegations, Dr. Russell found it particularly concerning that a 15-year old teenager was in the same room as a 5-year old child. Dr. Russell concluded that "Father was not able to provide a safe environment for the children." (*Id.* at 36).

DHS social worker Sayeeta Fowler testified that she became involved with the family in April 2018 because of allegations of child abuse and neglect. (*See id.* at 45). Among other incidents, one of the older siblings sustained two black eyes and Mother was indicated as the perpetrator of the abuse.

Case manager Denia Jones testified that she was involved with the family from 2016 until 2022. While the initial involvement was due to truancy, that changed in 2018 when there was a report that a sibling was hit in the eye with a broom. During a visit to the residence, Ms. Jones observed black mold and "the ceiling was coming apart, coming down in the kitchen. There were plumbing issues in the home." (*Id.* at 56). Although Parents made some

initial progress regarding truancy, they often did not go to Children's medical appointments. Parents discontinued compliance with monthly safety visits in June 2018 when M.C. and J.C. were committed into placement. The initial goal for the family was reunification if mental health, housing, parenting, Children's medical issues and domestic violence concerns were addressed.

Ms. Jones recounted that the youngest two children, K.C. and D.C., were put into placement in August 2019 after Mother and D.C. (child) tested positive for cocaine when she gave birth to D.C. At that point, because they were living in the same home, both Parents were asked to submit to random drug screens. Because of their long-standing non-compliance with screening, Parents were ordered to submit to testing at an October 14, 2021 hearing and they tested positive for cocaine. At the next hearing on October 21, 2021, another test was ordered and Parents again tested positive for cocaine.

Ms. Jones explained that Father did complete a parenting course and his income is comprised of disability benefits as well as "working under the table." (*Id.* at 76). Although Father reported that he was receiving mental health treatment, Ms. Jones was not able to obtain verifying documentation and Father did not provide any. In January 2022, when Ms. Jones departed from the case, the family resided in a two-bedroom Philadelphia Housing Authority (PHA) apartment that was not large enough to accommodate Children. Father was not attending drug and alcohol treatment, he did not submit to random drug screens, and Ms. Jones had no documentation indicating Father has

received mental health treatment. Ms. Jones testified that although Parents were affectionate with Children, this does not necessarily translate into a parent-child bond, and that Children are resilient and would not suffer irreparable harm if Parents' rights were terminated. (**See id.** at 89, 105). She also noted that Children would look to their foster parents for guidance.

Case manager Tyeesha Grasty testified that she had been providing case management for the family for about eight weeks since January 2022, and that she believes that termination of parental rights and a goal change to adoption is in Children's best interests. Although Parents have supervised visitation with Children for one hour per week, they often arrive 15-20 minutes late, leaving them with just the remainder of the one-hour time period.

With regard to K.C. and D.C., they have resided in a pre-adoptive home since D.C.'s birth in August 2019 when K.C. was one-year old. They "look to their resource parents as their parents and the people who provide and meet their basic needs." (**Id.** at 120) Ms. Grasty opined that Children would not be irreparably harmed if Parents' parental rights were terminated, and that reunification is not a viable option "because of the inconsistency of the parents meeting their objectives for the single case plan throughout the life of this case." (**Id.** at 121).

On cross-examination, Ms. Grasty acknowledged that Father was compliant when she asked him to sign releases for mental health records.

However, she specifically informed Father that it is his responsibility to provide DHS with his own records, which he failed to do.

Father testified that he has participated in therapy and completed parenting classes. He receives two monthly disability payments in the amounts of $188 and $673 due to his bipolar disorder. As to his current therapy regimen, he explained, "I'm really not going now. I go for therapy on the phone once a week and I go every three months for meds." (*Id.* at 130). Father described typical visits with Children as follows: "when they see us, they just run to us and they almost knock us down. And they always want to play with my wife's or my phone. We watch movies with them." (*Id.* at 131). Father generally denied arriving late to visits with Children, and he explained that any lateness was caused by traffic. Regarding the family living situation, Father explained that although he and Mother spent one year homeless, they were able to secure a two-bedroom PHA apartment and would be able to obtain a larger unit upon reunification with Children. Father testified that he has a strong parental bond with Children, and that he and Children would be devastated if his parental rights were terminated. Father also indicated that he attends drug and alcohol treatment once every 2-3 weeks and that he takes suboxone.

At the conclusion of the proceeding, the juvenile court noted its familiarity with the DHS witnesses because of their participation in several other cases before in which they demonstrated consistent high levels of

credibility and knowledge about their cases. In contrast, the juvenile court found Parents' testimony "self-serving" and observed that while they testified to their love for Children, they failed to take meaningful steps to address the mental health, drug or housing issues that led to Children's placement. (*Id.* at 146). The juvenile court determined that considering the testimony as a whole, all elements for termination of Parents' rights under Section 2511(a)(1), (2), (5) and (8) of the Adoption Act were met and that termination would serve Children's best interests.[2] The court entered decrees involuntary terminating the rights of Parents to Children pursuant to Section 2511 (a) and (b) and entered orders changing Children's permanency goal to adoption. Father timely appealed and he and the juvenile court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)(2)(i)-(ii).

## II.

Father first challenges the juvenile court's decision to terminate his parental rights to Children and its finding that termination is in their best interests.[3] The following legal principles guide our review.

---

[2] *See* 23 Pa.C.S. § 2511(a)-(b).

[3]

> Our standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse

*(Footnote Continued Next Page)*

Section 2511 governs termination of parental rights and requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the trial court determines that the parent's conduct warrants termination of his or her parental rights does the trial court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re S.C.*, 247 A.3d 1097, 1103 (Pa. Super. 2021) (citation omitted).

"A child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* (citation omitted). When a parent has demonstrated a continued inability to conduct his life in a manner conducive to providing a safe environment for a child, and the behavior is irremediable as supported by clear and competent evidence, the termination of parental rights is justified. *See id.* at 1105.

---

of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020) (citation omitted).

In this case, the juvenile court terminated Father's rights pursuant to Sections 2511(a)(1), (2), (5), (8) and (b), which provide as follows:

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

*   *   *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

*   *   *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

*   *   *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1),(2), (5), (8) and (b).

**A.**

Father contends that termination of his parental rights constituted an abuse of discretion because he has taken steps to maintain his relationship with Children, has visited them consistently, and "did not miss a visit with the Children . . . even for a time that he was homeless." (Father's Brief, at 18). According to Father, Dr. Russell's 2019 evaluation is outdated and failed take into his consideration his completion of parenting classes and a domestic violence program as well as disregarded his testimony that PHA would provide larger housing to the family upon his reunification with Children. (*See id.* at 19). Father also contends that DHS did not establish "any nexus between the fact that he tested positive for cocaine and his ability or willingness to parent the Children." (*Id.* at 22).

The juvenile court found, however, that termination was warranted under Section 2511(a). It explained its rationale as follows:

Though [a different juvenile court judge] started out with this case, I took over two years ago [], and have had the benefit of exposure to the parents throughout that period of time.

As I mentioned earlier, the last hearing I observed what appeared to be two parents under the influence. I stopped the hearing and ordered them to go and get a drug test, and they tested positive for cocaine. And this is a continuation of a four-year cocaine dependency for which they, for the most part, declined therapy and treatment.

Father says he's getting some type of treatment. He's getting suboxone. I wasn't aware that suboxone was an antidote to cocaine; but be that as it may, father presents no records.

\* \* \*

I heard the testimony. I'm familiar with the history of the case and the attempts we've tried, the services we've offered, the requirements we set forth as clearly as we can set forth those requirements— and that is, provide evidence that you're receiving mental health treatment, that you've remedied bipolar issues for which you're receiving benefits. I see nothing and I heard nothing to indicate that was occurring.

\* \* \*

Taking all the evidence as a whole . . . I resolve any conflict in the testimony in favor of the Department . . . who have had the ability to monitor these cases going back to the older children 41 months. The two younger children don't even know who you are. . . . Mother was positive with cocaine when the last child was born.

(N.T. Hearing, at 145, 147-48).

We discern no error of law or abuse of discretion in this assessment. Despite the well-known issue of substance abuse in this case and the requirement that Parents resolve it, Father has resisted compliance with drug screenings and has not provided any documentation demonstrating his

treatment or sobriety. As far as housing, Father fails to recognize the seriousness of placing Children at differing ages and developmental stages in shared bedrooms, even after allegations of sexual abuse. Father also does not appear to recognize that his current income, derived primarily from disability payments, in combination with PHA housing, cannot adequately sustain a family of this size. Additionally, Father's bipolar disorder is purportedly treated with phone calls and medication pick-ups rather than by more intensive therapy, and he has not provided documentation to substantiate that his mental health is a priority. Simply put, Father appears willfully blind to the reality of what is required to raise Children and the evidence amply supports the juvenile court's decision to terminate his parental rights.

**B.**

Father also disputes the juvenile court's finding that termination of his parental rights would serve Children's best interests under Section 2511(b). In doing so, he maintains that he "shares a bond with Children [and] has consistently visited them for years and has remained a presence in their lives." (***Id.*** at 24).

In considering Section 2511(b), we are guided by the following tenants:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond,

if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**D.R.-W.**, **supra** at 914 (citations omitted).

In this case, the record supports the juvenile court's conclusion that "the testimony is clear and convincing that it would be in the best interests of the children that parents' rights be terminated at this point." (N.T. Hearing, at 149). The court observed with regard to M.C. and J.C. that Parents offered them rewards during their supervised visits instead of parenting them, and that K.C. and D.C. do not know who Father is given their early placement. As detailed above, Father has minimal contact with Children and fails to take full advantage of that time, as he arrives late and watches movies with them rather than interacting in a meaningful fashion. Although Father testified that both he and Children would be devastated if his parental rights were terminated, Ms. Grasty and Ms. Jones testified to the contrary that termination would serve Children's bests interests and would not cause them to suffer irreparable harm. Children look to their resource parents as their parents and the people who provide them with guidance and meet their basic needs. We

discern no abuse of discretion concerning the juvenile court's best interests analysis.

## III.

Father next claims that the juvenile court abused its discretion in changing Children's placement goal to adoption. (*See* Father's Brief, at 26-28). Father maintains that he "spent years being fully compliant with his objectives" and the only reason reunification was not accomplished was because of positive drug screens. (*See id.* at 27).

However, because we have concluded that the juvenile court did not abuse its discretion in granting the petition to terminate Father's parental rights, this issue is moot. *See Interest of A.M.*, 256 A.3d 1263, 1272 (Pa. Super. 2021) (effect of decision to affirm juvenile court's termination decree necessarily renders moot court's decision to change Child's goal to adoption).

Even if we were to reach the merits of this issue, we would conclude that no relief is due. When deciding whether to change a child's permanency goal, the trial court must consider: "(1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least

fifteen of the last twenty-two months." *Id.* at 1273 (citation omitted). A court must also provide compelling reasons why it is not in the best interest of a child to return to his or her parents and to instead be placed for adoption. *See id.*

Here, as detailed above, several credible DHS witnesses testified to Father's lack of progress towards alleviating the circumstances necessitating Children's placement in the first place, as well as to his inability to provide a safe and appropriate living environment for them after many years of available services and intervention. In short, the evidence supports the conclusion that reunification of Father with Children is not a viable option and that the juvenile court did not abuse its discretion in changing Children's permanency goal to adoption. Accordingly, we affirm the decrees involuntarily terminating Father's parental rights to Children and the orders changing their permanency goal to adoption.

Decrees affirmed. Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/12/2022