J-A08042-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: E.R.C., A/K/A E.R.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.V.-I., FATHER | : | |
| | : | |
| | : | No. 1357 WDA 2022 |

Appeal from the Order Entered October 27, 2022
In the Court of Common Pleas of Somerset County Orphans' Court at
No(s):  No. 7 Adoption 2022

BEFORE:  STABILE, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED: June 28, 2023**

J.V.-I. (Father) appeals from the order entered in the Court of Common Pleas of Somerset County (orphans' court) involuntarily terminating his parental rights to his daughter, E.R.C., born in July 2012 (Child).[1]  We affirm.

**I.**

Somerset County Children and Youth Services (CYS) initially became involved with the family in August 2018 because of allegations that Mother was using methamphetamines and Child was exposed to domestic violence between Mother and maternal grandmother in the home.  CYS had not

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The parental rights of Child's biological mother R.C. (Mother) were also involuntarily terminated.  Mother did not appear at the orphans' court hearing and is not a party to this appeal.

identified Father as Child's biological father at that time. Father's paternity was established through genetic testing while he was incarcerated in July 2020 and he is currently incarcerated. Child was adjudicated dependent in April 2020 and her permanency goal was changed to adoption in January 2022. CYS filed petitions seeking involuntary termination of Father and Mother's parental rights on March 14, 2022.

At the October 27, 2022 hearing, the orphan's court heard testimony from CYS Caseworker Amber Shonko, licensed psychologist Carol Patterson, the Court-Appointed Special Advocate (CASA) Paula Eppley-Newman, and Father. Child was ten years old at the time.

Ms. Shonko testified that she has been involved with the family since December 2020 and that after a number of placements, Child resides with a foster family willing to adopt. (*See* N.T. Hearing, 10/27/22, at 39-41). Child has been diagnosed with a conduct disorder, PTSD and ODD, and she is taking medication for treatment. Ms. Shonko advised that Father completed the classroom portion of the parenting program but has not had any in-person visits with Child to demonstrate any acquired skills. Father has completed a drug and alcohol treatment program, but not the additional assessment requested by his parole officer or a mental health evaluation.

Ms. Shonko explained that Father was incarcerated at the time CYS was granted custody of Child, that he was released to a halfway house in the beginning of 2021, and that he absconded from that residence in April 2021.

Father did not contact CYS when he left the halfway house and Ms. Shonko's attempts to call him using his last known telephone number and a subsequently obtained telephone number were unsuccessful. CYS received information that Father was reincarcerated in September 2021, and that he absconded again upon placement in a re-entry program in November 2021. Father was then reincarcerated in April 2022 and was released back to a halfway house in July 2022. Ms. Shonko attempted to schedule in-person visits between Father and Child when he was released, and she contacted Father's mother, who resided in Arizona, for assistance but she was not able to establish contact with him. Ms. Shonko advised that it was very difficult to schedule visits with Father because of the multiple facilities he was housed during a relatively short period of time.

Ms. Shonko testified that since the time Father was identified as Child's biological father, they had five video visits and Father consistently made phone calls to her for a brief period in 2021. At that point, Child reported to CYS that she no longer wanted to have any contact with Father. Ms. Shonko testified that CYS never refused Father contact with Child, that it never asked for visits to be suspended, and that it placed no restrictions on the frequency or duration of phone calls. Ms. Shonko recounted that although Father wrote letters to CYS "on a couple of different occasions," she did not receive weekly phone calls from him and he never reported that he had any problems contacting Child. (*Id.* at 70). Ms. Shonko explained that "whenever [Father]

would abscond from a facility, [CYS] would have no contact with him for months at a time. [Child] would not have any contact for months at a time." (*Id.* at 74). Child "questioned why her dad wanted to be a part of her life when he was incarcerated; and then as soon as he was released from incarceration, she was put on the back burner." (*Id.*).

Child has indicated to Ms. Shonko that she enjoys living with her current foster parents and that she wants to be adopted by them. Ms. Shonko opined that Child's best interests would be best served by termination of Father's parental rights so that Child can find permanency. Although placement with the foster family is early, Child "has foster brothers that she absolutely adores and they adore her." (*Id.* at 75). Ms. Shonko opined based on her experience that Child is not receiving any benefit from her relationship with Father and "won't even talk to him. I had supervised numerous phone calls where dad gets on the phone and he talks [] and she absolutely refuses to answer. She won't even talk to me during those phone calls." (*Id.* at 75-76). Child speaks her mind and "absolutely does not want to be placed in the care of her father." (*Id.* at 76).

Ms. Patterson was qualified as an expert in the field of psychology with an emphasis on bonding and attachment assessments. Although she conducted an evaluation with Child and Mother, she was not able to do the same with Father because he was "on the run after leaving a halfway house" at the time. (*Id.* at 19). Ms. Patterson opined that, given the very limited

interaction between Child and Father, they have not had the opportunity to form a parental bond, and that if they were reunified or began regular visitation, they would not be able to form a healthy parental bond. (*See id.* at 25-26).

Paula Eppley-Newman, the CASA volunteer for Child since 2020, testified that Child "is very articulate, but I think is just craving security, craving that foundation that every kid can build on" and that termination of Father's parental rights would meet her needs and welfare. (*Id.* at 108). Although Ms. Eppley-Newman was unable to contact Father, Child's position of: "I don't want to live with him; I don't know him" was sufficient to communicate that Child is not comfortable with contact with Father and that the possibility of living with him causes her anxiety. (*Id.* at 110). Ms. Eppley-Newman explained that part of the goal at her agency is family strengthening with the biological parent, but that "sometimes, it's just not the best place for them." (*Id.* at 111-12).

Father testified that he called Ms. Shonko two to three times per month and although he "absconded a few times, it was for a short period of time." (*Id.* at 123-24). Father relayed that he called Ms. Shonko "constantly because I wasn't getting my phone calls or my visits and that was the only way I would be able to find out what was going on with my child," and that it was very difficult to maintain contact with Child. (*Id.* at 124). Father explained that his parole officer had requested that he complete a second drug treatment

program because his original sentence and current period of incarceration were for drug offenses. Father advised that his maximum release date is August 26, 2023, and that upon release he will live with his wife and son who reside in Buffalo, New York. Father testified his goal is to "be able to care for [Child] and show her that I love her and that I want to bond with her and that I want to get to know her." (***Id.*** at 137).

At the conclusion of the hearing, the orphans' court entered findings of fact and conclusions of law and issued an order involuntarily terminating Father's parental rights to Child pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8) and (b). In doing so, it found that for the majority of Child's lifetime and specifically while she has been in placement, Father has consistently been incarcerated, living in a halfway house, or had absconded from halfway houses; for the period of 2020-22, Father has been incarcerated in or admitted to at least ten different correctional facilities and halfway houses; Father has maintained a criminal lifestyle since 2007 and will be incarcerated until at least August 2023; Child experiences anxiety when required to discuss her relationship with Father and the possibility of living with him; Child wishes to be adopted by current foster parents; Father has moderately complied with certain goals but has demonstrated minimal progress with respect to completion of these goals; Father has never lived with Child or had in-person contact with her; Ms. Eppley-Newman credibly testified that Child does not want to live with Father because she does not know him; no bond or

attachment exists between Father and Child due to their lack of interaction; terminating Father's parental rights would have no negative impact on Child; and Child's best interests would be served by allowing her to move towards permanency immediately, rather than wait until a time Father is not incarcerated and can attempt to provide parental care for her. (**See id.** at 184, 186-87, 191-92). Father timely appealed and he and the orphans' court complied with Rule 1925. **See** Pa.R.A.P. 1925(a)(2)(i)-(ii).

## II.

## A.

Father's issues on appeal challenge the orphans' court decision that termination of his parental rights to Child is warranted and its finding that termination serves Child's best interests.[2] (**See** Father's Brief, at 5-7).[3]

---

[2] We note that although Father initially presents his argument as five separate issues, he combines them into a single argument in the body of his brief. (**See** Father's Brief, at 15-18). We address them together for ease of disposition.

[3]

> Our standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

The following legal principles guide our review. Section 2511 of the Adoption Act governs termination of parental rights and requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the trial court determines that the parent's conduct warrants termination of his or her parental rights does the trial court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re S.C.*, 247 A.3d 1097, 1103 (Pa. Super. 2021) (citation omitted).

"A child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* (citation omitted). When a parent has demonstrated a continued inability to conduct his life in a manner conducive to providing a safe environment for a child, and the behavior is irremediable as supported by clear and competent evidence, the termination of parental rights is justified. *See id.* at 1105.

In this case, the orphans' court terminated Father's rights pursuant to Sections 2511(a)(1), (2),(5),(8) and (b), which provide as follows:

---

*Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020) (citation omitted).

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*     \*     \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*     \*     \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*     \*     \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8) and (b).[4]

We are also mindful that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." **Int. of K.M.W.**, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation omitted). While incarceration is not sufficient to support termination under any subsection, it does demonstrably impact a parent's capability of performing parental duties and may render him incapable of fulfilling these obligations. **See id.**

**B.**

Father first contends that termination of his parental rights constituted an abuse of discretion because he has made significant efforts to follow the recommendations set by CYS by attending parenting classes/substance abuse treatment programs and by maintaining contact with Child through video calls,

---

[4] We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section (b) in order to affirm. **See In re Adoption of A.H.**, 247 A.3d 439, 442 (Pa. Super. 2021), *appeal denied*, 258 A.3d 1144 (Pa. 2021). "Moreover, we may uphold a termination decision if any proper basis exists for the result reached." **Id.** (citation omitted).

telephone calls and mail. (*See* Father's Brief, at 14-15). Father asserts that CYS impeded his efforts by failing to aid him in maintaining contact with Child, that he "beg[ed] for more time," and that any perceived incapacity that he has will be remedied when he is released from incarceration. (*Id.* at 16).

We observe regarding the Juvenile Act and CYS's obligations thereunder that its goal is to "preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1). The Act is additionally intended to "prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." *Interest of A.M.*, 256 A.3d 1263, 1273 (Pa. Super. 2021) (citation omitted). As a result, "an agency is also not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. However, an agency must redirect its efforts towards placing the child in an adoptive home only after the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed." *Id.* (citation omitted).

Here, although Father claims that he has made great strides towards accomplishing the goals set by CYS, the record reflects that he has put forth minimal effort at best to work towards establishing a parental role in Child's life. The record also belies Father's claim that CYS did not exercise reasonable efforts to reunite him with Child and, instead, shows that he declined to take

advantage of the opportunities offered to him. His own actions resulted in any impediments to scheduling in-person visits with Child, which Ms. Shonko repeatedly attempted to arrange. Father resided in ten different facilities during a short period of time and absconded multiple times, with his whereabouts unknown. Father has been incarcerated for most of Child's lifetime, has maintained a criminal lifestyle since 2007, and will remain incarcerated until at least August 2023 when he plans to move to Buffalo, New York. Father's status as Child's biological parent was not established until she was about eight years old, and instead of focusing on developing a relationship with her, Father put her "on the back burner" while on the run from authorities. Because the record demonstrates Father's inability and unwillingness to fulfill his parental obligations, his first issue merits no relief.

**C.**

Father next contends the orphans' court erred in finding that termination of his parental rights is in Child's best interests under Section 2511(b). Father claims that he has established a clear bond with Child, is familiar with details about her life including her favorite food and best friend, and will be able to provide for her physical and emotional needs upon his release from incarceration. (*See* Father's Brief, at 16-18).

In considering Section 2511(b), we are guided by the following principles:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and

emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*D.R.-W.*, *supra* at 914 (citations omitted).

In this case, multiple credible witnesses testified that termination of Father's parental rights would serve Child's best interests. Father and Child have never met in person, have formed no parent-child bond, and discussion of their relationship and potential living situation is anxiety-provoking for Child. Child refuses to speak with Father and she has strongly expressed that she does not want to live with him and wishes to be adopted. The evidence supports the conclusion of the orphans' court that termination of Father's parental rights would best serve Child's needs and welfare. We, therefore, affirm the order pursuant to Section 2511(b).

Order affirmed.

Judge Stabile joins the memorandum.

Judge Sullivan concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/28/2023</u>