J-S14032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R.-D., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.R., MOTHER | : : : : : : : | |
| | : | No. 16 WDA 2023 |

Appeal from the Order Entered December 1, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): CP-02-AP-0000080-2022

BEFORE: PANELLA, P.J., BENDER, P.J.E., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:            **FILED: MAY 31, 2023**

J.R. (Mother) appeals from the order entered in the Court of Common Pleas of Allegheny County (trial court) involuntarily terminating her parental rights to her daughter, D.R-.D., born in November 2019 (Child).[1] We affirm.

**I.**

Allegheny County Office of Children, Youth and Families (CYF) first received a report regarding the family from the hospital when Child was born because Mother was positive for THC and she admitted to smoking marijuana throughout her pregnancy. CYF remained involved because of allegations of

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child's biological father, W.D. (Father) signed a consent to adoption for Child on October 26, 2022. Child is in the care of Father's mother, T.J. (Paternal Grandmother) and she is Child's prospective adoptive parent.

untreated mental health and substance abuse issues, periods of incarceration for both parents and domestic abuse. CYF obtained an order for emergency protective custody of Child on August 2, 2020, upon the incarceration of both parents. Child has not returned to their care since that time and she was placed with Paternal Grandmother with whom she currently resides. Child was adjudicated dependent in September 2020 and CYF filed petitions seeking involuntary termination of Mother and Father's parental rights on June 30, 2022.

Several witnesses testified at the October 26, 2022 hearing, including CYF Caseworker Hannah Shankle, licensed psychologist Terry O'Hara, Ph.D. and Mother. Child was three years old at the time. Ms. Shankle testified that she has been involved with the family since February 2021 and that Mother has two other children, neither of whom are in her care.[2] At the time of Child's birth, Mother needed assistance with housing and has a criminal history including convictions for simple assault and criminal trespassing. Ms. Shankle relayed that Mother was difficult to locate, could not be reached on the phone, and no one was present at the residence for home visits. Mother was located in February 2020 with the use of a private investigation firm. She was then

---

[2] Mother's rights to one of her children were voluntarily terminated and another child resides with the father.

residing with a friend who had prior convictions for endangering the welfare of a child.

Ms. Shankle testified to concerns about Mother's mental health because she had expressed feeling overwhelmed with an inability to care for Child and wanted to put Child up for adoption. Mother reported to CYF that she had been diagnosed with "PTSD, ADHD, anxiety and borderline personality disorder. She stated that she was overwhelmed, that when she was pregnant, she had stopped her medication and she had not resumed medication at that point in time. She also informed CYF that she knows that she needs medication but that she was not currently taking them." (**See** N.T. Hearing, 10/26/22, at 79). CYF goals for Mother included participation in substance abuse treatment, behavioral health services, counseling for domestic violence issues, resolve her criminal matters including drug charges, abstain from further criminal activity, maintain appropriate housing, complete parenting classes, and attend visitation with Child.

Ms. Shankle also testified to domestic violence concerns regarding Mother and Father, as he had been arrested for assaulting her and she had obtained a PFA against him. Mother has participated in some of the services offered to her by CYF, including parenting and various treatment programs, and Child was happy to see Mother during supervised visits. However, visitation with Child was inconsistent, with Mother attending 42 out of the 128 in-person visits offered and 20 of the 60 virtual visits. Ms. Shankle opined

that termination of Mother's parental rights was needed because Child had been in placement for 26 months and Mother had not met or made significant progress towards any of her goals.

Ms. Shankle testified that has observed positive, appropriate interaction between Paternal Grandmother and Child during home visits and Paternal Grandmother provides Child with affection and comfort. (*See id.* at 143). Paternal Grandmother is being evaluated by CYF as an adoptive resource and will likely be approved. Ms. Shankle testified that Mother is not meeting any of Child's educational, psychological or developmental needs. While Mother and Child do have a relationship, the same concerns that were present in November 2019 persist despite Mother's opportunities to rectify them. Ms. Shankle also noted a significant decline in Mother's progress since March 2022 with regard to her multiple incarcerations, housing issues and inconsistency in visitation. (*See id.* at 145). Ms. Shankle opined that termination of Mother's parental rights would not negatively impact the Child and she stated that Child is engaged in services to prepare for adoption designed to assist with any emotional impact.

Dr. O'Hara was qualified as an expert in the area of child and forensic psychology and he testified that although Mother was generally cooperative during the evaluation process, she did not assume responsibility for her circumstances. Dr. O'Hara diagnosed Mother with unspecified depressive disorder and he testified that she exhibited signs of major depression, PTSD,

moderate alcohol abuse disorder and partner physical violence. (*See id.* at 45-46). Dr. O'Hara noted that Mother showed positive parenting skills towards Child, including encouraging reading, and he opined that termination of her rights would have some detrimental effect. However, he observed that Mother and Child had only had about 20 visits over the course of a year, and that under such circumstances, it would be very difficult for any child to develop a secure attachment with a caretaker and view that person as a dependable source of care and comfort. (*See id.* at 49-50). Dr. O'Hara advised against reunification, especially in light of the very positive and secure relationship the Child has with Paternal Grandmother, who shows strong parenting skills towards Child. Dr. O'Hara also opined that based on his 20 years of experience working with children, "that there is an urgency of permanency," at Child's age. (*Id.* at 54).

Mother testified that she has participated in parenting, mental health and domestic violence programs offered by CYF. She explained that her primary residence is in Erie with her parents, and that she rents an apartment at her uncle's home in Allegheny County. Mother acknowledged that when Child was born, she needed assistance with obtaining safe housing and resuming therapy and medication. (*See id.* at 183). Mother stated that she attends Alcohol Anonymous meetings and that she has a medical marijuana card, although she did not submit a copy of the card to CYF. Mother explained that she has missed visits with Child because of transportation issues,

although she has been provided with bus tickets. She reported that her visits with Child go well and that she is in a position to care for Child at her parents' large property in Erie.

After the hearing, the trial court entered an order involuntarily terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), (8) and (b). In doing so, it found that Mother was not a credible witness; Ms. Shankle was exceptionally prepared and credible; Mother was incarcerated for 194 days of Child's first three years of life; Mother has not obtained appropriate, safe housing in that her housing in Allegheny County has been unstable and her housing in Erie not clearly established; Mother never progressed to unsupervised or overnight visits with Child; although the interactions between Mother and Child were positive, the court gave great deference to the opinion of Dr. O'Hara, who testified that it is difficult for a child to develop a secure relationship with an individual they see only 20 times per year. (Order, 12/01/22, at 2-4). Mother timely appealed and she and the trial court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)(2)(i)-(ii).[3]

---

[3] The trial court found Mother's issues on appeal, in which she generally challenged its Section 2511(a)-(b) analysis, waived for lack of specificity but addressed her claims in the event this Court found otherwise. (*See* Trial Court Opinion, 1/30/22, at 19); *see also* Pa.R.A.P. 1925(b)(4)(vii). Because we are able to discern Mother's issues from the record, we decline to find waiver.

**II.**

**A.**

Mother's issues on appeal challenge the trial court's decision that termination of her parental rights to Child is warranted, and its finding that termination serves Child's best interests is not supported by clear and competent evidence.[4]

The following legal principles guide our review. Section 2511 of the Adoption Act governs termination of parental rights and requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the trial court determines that the parent's conduct warrants termination of his or her parental rights does the trial court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare

---

[4]

> Our standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***Interest of D.R.-W.***, 227 A.3d 905, 911 (Pa. Super. 2020) (citation omitted).

analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re S.C.*, 247 A.3d 1097, 1103 (Pa. Super. 2021) (citation omitted).

"A child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* (citation omitted). When a parent has demonstrated a continued inability to conduct her life in a manner conducive to providing a safe environment for a child, and the behavior is irremediable as supported by clear and competent evidence, the termination of parental rights is justified. *See id.* at 1105.

In this case, the trial court terminated Mother's rights pursuant to Sections 2511(a)(2), (5),(8) and (b), which provide as follows:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the

removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. §§ 2511(a) (2), (5), (8) and (b).

We are also mindful that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." *Int. of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation omitted). While incarceration in itself is not sufficient to support termination under any subsection, it does demonstrably impact a parent's capability of performing parental duties and may render her incapable of fulfilling these obligations. *See id.*

**B.**

Mother first contends the trial court erred in terminating her parental rights because she has remedied the conditions that led to Child's removal by addressing her criminal matters, participating in parenting classes and various treatment programs, and by implementing the skills she has developed during her visits with Child. Mother maintains that she is in a "much better place now than when [Child] was removed," that the evidence was insufficient to establish that termination is warranted, and that the evidence instead demonstrates that she is able to provide Child with essential parental care. (*Id.* at 24).

We observe with regard to the Juvenile Act that its goal is to "preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1). The Act is additionally intended to "prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." **Interest of A.M.**, 256 A.3d 1263, 1273 (Pa. Super. 2021) (citation omitted).

In this case, although Mother claims that she has made great strides towards accomplishing the goals set by CYF, the record reflects that she has put forth minimal effort to work towards establishing a meaningful parental role in Child's life. As the trial court cogently explained:

> Mother has a long history of problems with her ability to adequately provide for her children's needs, give them a safe and

- 10 -

stable environment, and address her own needs to the degree that she can be a ready, willing, and able parent. Removal originally occurred because of housing instability and Mother's mental health needs, as well as her use of marijuana. It was later learned that mother also struggled with alcohol. Mother was consistently evasive with the Agency about her housing, mental health treatment, and drug and alcohol treatment. While mother made genuine attempts to address her ability to parent her children, they were inconsistent and unsuccessful.

\*   \*   \*

[Mother was] exceptionally inconsistent with visitation, missing approximately one-third of all visits, and was evasive about her housing situation. Mother's housing status was often unknown—she reported to the Agency living in the Erie area, but would then report living in various locations in Allegheny County. This inconsistency continued despite receiving housing-search assistance from Ms. Shankle. Where mother lived was much less important than her location being consistent. Her changing housing led to issues with finding her for visitation and providing transportation assistance. . . .

The child needs a permanent, stable home and the demonstrated history of this case as well as the testimony of Dr. O'Hara makes clear that Mother cannot provide that. Mother never progressed past supervised visitation, and even at that, missed a third of the offered visits. Her inconsistency and unreliability in treatment and unstable housing, as well as her repeated incarceration demonstrate that she is currently incapable of providing a safe, stable, permanent home for the Child. This Court does not place weight on incarceration on its own, but when that incarceration is the result of repeatedly missing court dates and violating bond conditions, such behavior is strong evidence of instability and unreliability. The Child needs a stable and reliable caregiver, and Mother is currently incapable. . . .

The evidence in this case establishes that at no point from Removal in August 2022 to the present, has Mother been ready, willing, and able to meet the Child's developmental, physical, and emotional needs. Her lack of progress in establishing stable housing and inconsistency with treatment coupled with her inconsistency in visitation and repeated stints of incarceration make this clear. Mother has been incarcerated for approximately

- 11 -

one fifth of the Child's life. She has not engaged with treatment in a manner that has allowed her to make any progress towards stability. She has not visited consistently and Dr. O'Hara has explained that it is "very difficult for a child to develop security in one's attachment with a caregiver without not only meaningful contact, but consistent contact." He continued that "it would be difficult from my perspective, theoretically for a child to be able to develop attachment security with only twenty meetings with the caregiver over the course of the year."

(Trial Ct. Op., at 22-25).

Therefore, although Mother claims to have made progress, the record demonstrates that the same conditions that led to CYF's involvement since Child's birth persisted three years later, despite Mother's opportunities to rectify them. In fact, Ms. Shankle testified to a significant decline in Mother's progress since March 2022 with regard to her multiple incarcerations, housing issues and inconsistency in visitation. As noted above, the trial court, after hearing the witnesses and observing their demeanors, found Ms. Shankle extremely prepared and credible, and that Mother was not a credible witness. Because the record demonstrates Mother's inability or unwillingness to fulfill her parental obligations, her first issue merits no relief.

**C.**

Mother next contends the trial court erred in finding that termination of her parental rights is in Child's best interests under Section 2511(b). Mother maintains that she has a strong bond with Child and that termination would unnecessarily and permanently deprive Child of the loving relationship she has with Mother. Mother points to the testimony of Dr. O'Hara, who indicated that

Child valued her relationship with Mother and termination of Mother's parental rights would have a detrimental impact.

In considering Section 2511(b), we are guided by the following principles:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*D.R.-W.*, *supra* at 914 (citations omitted).

Instantly, credible witnesses testified that termination of Mother's parental rights would serve Child's best interests and that reunification should not be the goal given Child's need for permanency. The trial court found:

> It is [] important to note that Dr. O'Hara stressed the need for permanency for a child this age. Mother cannot provide that necessary permanency. Mother has made no meaningful progress towards being able to meet the developmental, emotional, and physical needs of the child, and as a result, termination is in the Child's best interest. Importantly though, foster mother has

- 13 -

consistently taken the child to all medical appointments and is meeting the child's educational and developmental needs.

(Trial Ct. Op., at 25) (record citation omitted).

Although Mother points to the testimony of Dr. O'Hara in support of her argument, she cherry picks from his testimony to paint it in the light most beneficial to her, while wholly ignoring the fact that he advised against reunification and opined that her lack of contact with Child made it extremely unlikely that any type of secure relationship could have formed between them in contrast to the consistent and caring relationship Child has developed with Paternal Grandmother who meets all of Child's needs and Child looks to as a source of comfort and support. Because the evidence supports the trial court's conclusion that termination of Mother's parental rights would best serve Child's needs and welfare, we affirm its order pursuant to Section 2511(b).

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/31/2023