J-S48015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2357 EDA 2024 |

Appeal from the Order Entered August 2, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No: CP-64-DP-0000032-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2358 EDA 2024 |

Appeal from the Decree Entered July 30, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No: 2024-00009

| | | |
|---|---|---|
| IN THE INTEREST OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2359 EDA 2024 |

Appeal from the Order Entered August 2, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No: CP-64-DP-0000033-2022

J-S48015-24

IN THE INTEREST OF: L.B., A MINOR   :   IN THE SUPERIOR COURT OF
:         PENNSYLVANIA
:
APPEAL OF: A.L.H., MOTHER      :
:
:
:
:
:
:
:   No. 2360 EDA 2024

Appeal from the Decree Entered July 30, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No:  2024-00010

BEFORE:  STABILE, J., NICHOLS, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.:          **FILED APRIL 21, 2025**

A.L.H. ("Mother") appeals from the July 30, 2024, decrees that involuntarily terminated her parental rights to her son, A.B., Jr., born in September of 2019, and daughter, L.B., born in January of 2022 (collectively, "the Children").[1]  Mother also appeals from the August 2, 2024 orders that changed the Children's permanency goals from reunification to adoption. After careful review, we affirm the involuntary termination decrees and dismiss the appeal from the goal change orders as moot.

The certified record reveals the following relevant facts and procedural history.  This family came to the attention of Wayne County Children and

_____

[1] The parental rights of A.M.B., the Children's father ("Father") (collectively with Mother, "Parents"), were also involuntarily terminated by the same decrees.  Father separately appealed the involuntary termination decrees and goal change orders at 2353-56 EDA 2024, which we address in a separate memorandum.

- 2 -

Youth Services ("CYS" or "the Agency") after the Agency received a report in approximately November of 2022, alleging that, *inter alia*, Parents used methamphetamines in the family home. It was further alleged that Father then kicked Mother out of the home. Upon investigation, Parents each admitted to methamphetamine use. The Agency implemented an out-of-home safety plan wherein the Children were placed with a maternal aunt. On December 6, 2022, Parents entered into a voluntary agreement with CYS for the placement of the Children with a foster care family.

On January 4, 2023, the court adjudicated the Children dependent. Thereafter, the court established the Children's respective permanency goals as reunification. In furtherance of this goal, Mother was ordered to, *inter alia*, follow drug and alcohol treatment recommendations and obtain stable housing.[2]

The court placed the Children with a new kinship resource on January 7, 2023. On May 27, 2023, the Children were moved to their fourth placement with pre-adoptive foster parents, M.M. and A.M. ("Foster Parents"), where they remained at the time of the subject proceedings.

The record does not reveal whether Mother completed drug and alcohol treatment. Over the course of the dependencies, Mother had multiple drug

---

[2] We note that Mother was not explicitly ordered to complete a drug and alcohol evaluation for reasons not divulged in the record, although she was ordered to follow treatment recommendations.

- 3 -

screens that produced an "unusually dilute" result, which were to be interpreted with "caution[.]" CYS Exhibit 1 at 7-8; N.T., 7/23/24, at 50-51.

Mother's housing situation varied over the course of the proceedings. Mother lived in a room in a shared residence with roommates in Wayne County from November of 2022 to May of 2024, which was deemed inappropriate for reunification due to concerns about Mother's roommates. *See* CYS Exhibit 1 at 7-8; N.T., 7/23/24, at 48. Sometime after Father became incarcerated in April of 2024, Mother moved into his apartment in Lackawanna County. *See* CYS Exhibit 1 at 8; N.T., 7/23/24, at 19-20, 23. Following conversations with Mother, CYS had concerns about her ability to maintain this housing without assistance from Father, who she reported was providing half of the rental funds but did not live there. *See* CYS Exhibit 1 at 8-9; N.T., 7/23/24, at 19-20, 30, 39.

On April 23, 2024, CYS filed petitions that included, *inter alia*, a request to change the Children's permanency goals from reunification to adoption. Two days later, on April 25, 2024, the Agency filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (b). The orphans' court held a combined evidentiary hearing on the petitions on July 23, 2024. At the time of these proceedings, the Children, then four and two years old, respectively, had been in CYS custody for twenty-two months. The Children were represented by

their court-appointed guardian *ad litem* ("GAL"), Lindsay Collins, Esquire.[3]

Mother was present, represented by counsel, and did not testify.  CYS

_____

[3] Our Supreme Court has mandated that this Court conduct *sua sponte* review to ensure that orphans' courts have properly appointed counsel to represent the legal interests of children in contested termination proceedings in conformity with 23 Pa.C.S.A. § 2313(a).  ***See In re Adoption of K.M.G.***, 240 A.3d 1218, 1234-36 (Pa. 2020).  When counsel is appointed to serve as both a child's legal interest counsel and GAL, this Court must also *sua sponte* review whether "the orphans' court determined that the child's best interests and legal interests did not conflict."  ***Id.*** at 1236.  It is well-established "that a single attorney cannot represent a child's best interests and legal interests if those interests conflict."  ***Id.*** (citing ***In re T.S.***, 192 A.3d 1080, 1082 (Pa. 2018).

Our review of the certified record in the instant appeals reveals that the orphans' court did not issue a separate order appointing the GAL to the dual representation of the Children's best and legal interests in the termination proceeding.  Consequently, no conflict determination was made.

We emphasize that our Supreme Court has placed the onus squarely and solely upon the orphans' courts to make these conflict determinations.  ***See K.M.G.***, 240 A.3d at 1236.  These findings must typically be conducted **before** counsel's appointment and should appear within the orders appointing counsel.  ***See id.*** (noting that our inquiry concerning a conflict finding "can be addressed by a review of the orphans' court order (or lack thereof) appointing counsel").

Our Supreme Court has explicitly forbidden *sua sponte* appellate review of the factual inquiry of whether the record shows that an attorney appointed to the dual role "had a conflict in representing both a child's legal interests and best interests."  ***Id.***  Accordingly, this Court remanded to the orphans' court with instructions for it to issue a definitive finding concerning any potential conflict in the Children's legal and best interests.  ***See*** Remand Order, 2/26/25, at 3-5.  In its response, the orphans' court affirmed that no conflict existed between the Children's best and legal interests.  ***See*** Supplemental Statement of Reasons, 3/5/25, at 1.  Thus, we find no structural error.

presented the testimony of its caseworker Brianna Clark and proffered two exhibits, which the court admitted without objection.[4]

By decrees dated and entered July 30, 2024, the orphans' court involuntarily terminated both Mother's and Father's parental rights to the Children. In addition, pursuant to the orders dated July 30, 2024, and entered on August 2, 2024, the court changed the Children's permanency goals from reunification to adoption.

Mother timely filed separate notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on September 18, 2024, which directed this Court to its July 30, 2024 opinion, which accompanied the subject decrees and orders. On October 2, 2024, this Court *sua sponte* consolidated Mother's multiple appeals pursuant to Pa.R.A.P. 513.

Mother presents the following issues for our review on appeal:

1. Whether the [orphans'] court erred in concluding that [] Mother lacked the essential parental care, control, and substance necessary to provide the minor child with the essential parental care?

2. Whether the [orphans'] court erred as a matter of law in determining that the [termination of] parental rights of [] [M]other [] was warranted?

3. Whether the [orphans'] court erred as a matter of law in determining that the termination of parental rights of [] [M]other

_____

[4] Father testified on his own behalf.

[] would serve the developmental, physical[,] and emotional needs and welfare of the minor child?

4. Whether the [orphans'] court erred as a matter of law in determining that a permanency goal change was warranted in that the current placement goal was no longer appropriate or feasible?

Mother's Brief at 6.[5, 6]  We will begin by addressing Mother's first three claims concerning the orphans' court's termination decrees.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.  Termination of parental rights has significant and

_____

[5] We have reordered Mother's issues for ease of disposition.

[6] We note with displeasure that the Children's GAL did not participate in the instant appeal.  The GAL advocated for termination of Parents' parental rights at the conclusion of the hearing.  *See* N.T., 7/23/24, at 74-76.

permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *See id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). For the reasons discussed *infra*, we conclude that the

certified record supports the termination decrees pursuant to 23 Pa.C.S.A. §

2511(a)(5) and (b), which provide as follows:[7, 8]

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[7] Pursuant to this Court's February 26, 2024 remand order, noted *supra*, the orphans' court additionally filed a supplemental Rule 1925(a) opinion clarifying that it terminated Mother's parental rights under Sections 2511(a)(2) and (5). *See* Supplemental Statement of Reasons, 3/5/25, at 1-5.

[8] Given our disposition as to Section 2511(a)(5), we need not review, and further make no conclusions as to, the orphans' court's findings pursuant to Section 2511(a)(2). *See B.L.W.*, 843 A.2d at 384.

23 Pa.C.S.A. § 2511(a)(5), (b).

In order to satisfy the requirements of Section 2511(a)(5), the petitioning party must produce clear and convincing evidence to establish: (1) the child has been removed from parental care for at least six months; (2) the conditions that lead to the child's removal or placement continue to exist; (3) the parent(s) cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parent(s) are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. *See In re B.C.*, 36 A.3d 601, 607 (Pa. Super. 2012).

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children

involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (internal citations, quotations, and footnotes omitted).

The Court further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Id.* at 1109. The "severance of a necessary and beneficial relationship [is] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-10. Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839. Further, this Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *Id*. Thus, we will not disturb such an

assessment if the orphans' court's factual findings are supported by the record. *See id.*

We begin with Mother's first and second issues, wherein she challenges the sufficiency of the evidence as to Section 2511(a). *See* Mother's Brief at 12-16, 21-23. Specifically, Mother argues that because she consistently complied with her goals, consistently attended visitation, and had a "strong bond" with the Children, that the conditions which led to the removal of the Children no longer existed at the time of the termination hearing. *Id.* at 23. She repeatedly highlights her evident "willingness" to remedy the conditions and dismisses evidence of her inability to maintain appropriate housing as speculative. *Id.* at 13-16. Mother contends that the record contained no evidence of how termination would serve the Children's best interests. *See id.* at 24. We disagree.

The record amply demonstrates that Mother has not overcome her illegal substance use and her inappropriate housing, which caused the Children's removal from her care. As to the Agency's initial involvement with the family, Ms. Clark testified that Mother left the Children in the home while Father was using methamphetamines and admitted to her own use of the same illegal drug. *See* N.T., 7/23/24, at 5-6. The certified record is devoid of evidence that Mother completed any type of drug and alcohol treatment over the course of the Children's dependencies. Ms. Clark stated that Mother

was not receiving drug and alcohol treatment at the time of the termination proceeding. *See id.* at 44.

In addition to not receiving any drug treatment, Mother tested positive for methamphetamines in April of 2024. *See* N.T., 7/23/24, at 10, 19, 32; CYS Exhibit 1 at 7. Mother argues that this was her only positive screen but fails to recognize the fact that this positive screen was only two months before the subject hearing. Significantly, Mother's counsel stipulated to the drug screens that produced "unusually dilute" results, which occurred on four of the thirteen screens from the current review period, and additional times over the course of the Children's dependencies. N.T., 7/23/24, at 50-51; CYS Exhibit 1 at 7-8; *see generally* Dependency Dockets. These results are specifically recommended to be interpreted with "caution" when showing negative for substances. CYS Exhibit 1 at 7-8.

Further, Ms. Clark testified that Mother's drug screens were consistently positive for marijuana, for which Mother had a valid prescription. *See* N.T., 7/23/24, at 18-19, 32, 42; CYS Exhibit 1 at 7-8. However, Ms. Clark testified to the following concerns surrounding Mother's marijuana use:

Q: Does the Agency have any concerns with her THC use?

A: There have been concerns for where she is getting her THC as [Mother] has stated to the [A]gency [that] she did not know that she could not get her THC off of the streets with her medical marijuana card.

Q: Are there concerns for any other substances other than THC?

A: There was a concern for methamphetamine use in April of 2024.

Q: [D]id the [A]gency ask her about her methamphetamine use?

A: Yes.

Q: And what was her response?

A: She stated that she had not used and she further explained that it may have been from THC that she purchased from a sketchy gas station in Scranton.

N.T., 7/23/24, at 19. Ms. Clark stated that Mother has provided a single receipt from a dispensary to show the source of her marijuana. *See id.* at 33. As such, the Agency continued to have concerns that Mother obtained her marijuana through illegal methods and potentially in conjunction with other illegal substances, as Mother alleged, considering she consistently used marijuana and tested positive for it on the morning of the subject hearing. *See id.* at 18-19, 32, 42.

Additionally, Ms. Clark testified that inappropriate housing was also a cause of the Children's removal. *See id.* at 7. Ms. Clark stated that Mother's main residence for the near entirety of the Children's dependencies, a room in a shared house, was inappropriate for reunification because Mother reported that she was sexually assaulted by her roommate. *See id.* at 48; CYS Exhibit 1 at 8. The Agency's documentation showed that Mother reported feeling unsafe in the home and that the roommate who sexually assaulted her abused alcohol. *See* CYS Exhibit 1 at 8. Mother was ineligible for "Section 8 due to recent criminal history and unpaid fines." *Id.* The Agency would have

assisted Mother with rent "if she could demonstrate the ability to pay the rent. This never happened." *Id.*

The record revealed that Mother moved into Father's apartment sometime after he was incarcerated in April of 2024, but the Agency could never confirm if the landlord knew she was there because Mother "revoked the release for the [A]gency to communicate with the landlord[.]" CYS Exhibit 1 at 8; N.T., 7/23/24, at 19-20, 23. Mother reported to CYS that she was not on the lease, which mirrors Ms. Clark's testimony that only Father is on the lease. *See* CYS Exhibit 1 at 8; N.T., 7/23/24, at 41-42. Ms. Clark testified that Mother told the Agency she has not paid rent, did not know how to pay rent or when it was due, and could not afford it without Father's contribution. *See* N.T., 7/23/24, at 20, 30, 39; CYS Exhibit 1 at 8-9. This uncontested testimony as to Mother's admissions belie her contention that the orphans' court's concerns are speculative.

Further, Mother reported to CYS that Father was not living with her in the apartment, but Father testified that he has been living there with her since he was released from jail. *See* N.T., 7/23/24, at 20, 23, 52-54. In light of the incident that brought the Children into care, particularly Parents' shared illegal substance use and Father kicking Mother out of their home, the Agency had concerns about Parents living together. *See id.* at 47, 57. Mother also repeatedly made recent statements to CYS that she did not feel safe living with Father. *See id.* at 24, 36, 40. The Agency was unaware that Parents

were residing together until the testimony at the subject hearing. *See id.* at 40. Mother's "back up" housing resource was a homeless shelter. *Id.* at 20.

The foregoing evidence clearly confirms that the conditions of the Children's removal, namely Mother's illegal substance use and inappropriate housing, continued to exist at the time of the termination proceeding. Therefore, the record unequivocally supports the orphans' court's finding that the conditions which led to the Children's removal from Mother's care continued to exist.

With respect to Mother's assertion that the record is devoid of evidence that termination would best serve the Children's needs and welfare, we conclude that the record evidence supports the orphans' court's findings. The record reveals that, since Parents agreed to the out-of-home safety plan, the Children had been moved through three different placements before their current pre-adoptive home due to Mother's inability to achieve reunification. Ms. Clark testified that Mother has not made the type of substantial progress that "would see the [C]hildren safely and imminently returned" to her care within the three months following the combined hearing. N.T., 7/23/24, at 26. Indeed, the record confirms that the Children could not be safely returned to Mother's care inasmuch as she did not have the requisite level of compliance and progress concerning the successful resolution of the above-discussed conditions that caused the placement of the Children. *See* N.T., 7/23/24, at

5-7, 10, 18-20, 23-24, 30, 32-33, 36, 39, 40-42, 44, 47-48, 50-54, 57; CYS Exhibit 1 at 7-9.

Therefore, the orphans' court's finding that termination of Mother's parental rights best served the Children's needs and welfare is supported by the record. Accordingly, we discern no abuse of discretion or error of law in the orphans' court finding that Mother's conduct warranted termination pursuant to Section 2511(a)(5).

Mother's third issue, her challenge to Section 2511(b), contends that CYS did not meet their evidentiary burden as to this subsection. *See* Mother's Brief at 24-25. Mother argues that the record contains no evidence of the parent-child bond or the intangibles as required by the Section 2511(b) analysis. *See id.* Further, she claims that the court "failed to appropriately address the bonding issue." *Id.* at 25. Mother's arguments lack factual merit and consequently fail.

The orphans' court found the following in regard to Section 2511(b):

For the last twelve [] months, the [] [C]hildren have been in a pre-adoptive placement with [Foster Parents.] . . . Mother attended [ninety-six percent] of visits offered with [the Children.] However, Mother's visitation has gone back and forth between supervised, monitored, and unsupervised. Ms. Clark did testify that a bond exists between Mother and the [] [C]hildren, but the [A]gency believes it is in the [C]hildren's best interests to have that bond severed.

. . .

The [c]ourt finds that termination of . . . Mother's . . . parental rights would be in the best interests of [the Children] because doing so would best serve their developmental, physical[,] and emotional needs and welfare. In addition, [the Children] have

- 17 -

been safe and provided for while in the care of [Foster Parents], whom []CYS has identified as a pre-adoptive resource. This [c]ourt . . . finds that termination is in the best interests of [the Children] under 23 Pa.C.S.A. § 2511(b).

Orphans' Court Opinion, 7/30/24, at 9-11 (citation omitted).

The orphans' court's findings are fully supported by the record evidence. Mother's visitation fluctuated between supervised and unsupervised due to concerns such as Mother's positive methamphetamine test and potential "coaching" of A.J., Jr. during her visits.[9, 10] N.T., 7/23/24, at 9-10; CYS Exhibit 1 at 3. Ms. Clark testified that Mother attended one hundred nineteen of one hundred twenty-four offered visits, which were positive and generally went well, with the exception of the aforementioned coaching by Mother. *See* N.T., 7/23/24, at 9-10, 31. Ms. Clark specifically testified that there was a bond between the Children and Mother, but she believed that it was in the Children's best interests that the bond be severed, and this decision included consideration for the Children's needs and welfare. *See* N.T., 7/23/24, at 10-11; CYS Exhibit 1 at 3. Evidence of positive supervised visitation, in and of itself, is not adequate for the orphans' court to find that the bond between

_____

[9] The certified record provides no further information regarding the timeline of the supervision changes or locations of Mother's visitation.

[10] Ms. Clark attested, which the documentation confirmed, that the concern arose from A.J., Jr., "saying that he was going to live with mommy and daddy and do things together." *Id.* at 31; CYS Exhibit 1 at 3. The Agency had no reports of A.J., Jr. making these types of comments before the subject visit with Mother. *See* CYS Exhibit 1 at 3.

Mother and the Children was sufficiently "necessary and beneficial," as to preclude the termination of her parental rights. **K.T.**, 296 A.3d at 1109-10. Additionally, Ms. Clark testified that the Children were "comfortable" and "doing very well" in their pre-adoptive home with Foster Parents, with whom they had been placed with for over twelve months. N.T., 7/23/24, at 7, 26-27. Ms. Clark stated that the Children are bonded to Foster Parents. **See id.** at 27.

Contrary to Mother's bald claims, the record contains the sufficient, foregoing evidence of the parent-child bond and other intangibles pursuant to this subsection. The orphans' court indeed analyzed the bond, as well as the relevant intangibles, as demonstrated by the above excerpt from its opinion. We reiterate that the extent of the bond analysis "necessarily depends on the circumstances of the particular case." **J.M.**, 991 A.2d at 324. As the Children had been in CYS care for twenty-two months at the time of the hearing, the orphans' court was well within its discretion to prioritize the Children's safety and security over their bond with Mother. **M.E.**, 283 A.3d at 839. Accordingly, we discern no error or abuse of discretion in the orphans' court's conclusion that the Agency met its evidentiary burden pursuant to Section 2511(b).

We now turn to Mother's final issue, which challenges the sufficiency of the evidence to change the Children's permanency goals from reunification to adoption. **See** Mother's Brief at 17-21. Given our disposition concerning

termination, Mother's remaining claim concerning her appeal from the goal change orders is moot. *See Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (finding issues regarding goal change moot in light of affirming the termination of parental rights). Accordingly, we dismiss Mother's appeal from the orders which changed the Children's permanency goals to adoption as moot. *See id.*[11]

Thus, we affirm the decrees with respect to the involuntarily termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (b). We dismiss the appeal from the goal change orders as moot.

Decrees affirmed. Appeal from goal change orders dismissed as moot.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/21/2025

---

[11] Even if not moot, for the reasons we have already discussed throughout this memorandum with respect to termination, the record confirms that changing the Children's respective permanency goals to adoption is in their best interest. *See In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011)).Appe

- 20 -

J-S48015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2357 EDA 2024 |

Appeal from the Order Entered August 2, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No: CP-64-DP-0000032-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2358 EDA 2024 |

Appeal from the Decree Entered July 30, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No: 2024-00009

| | | |
|---|---|---|
| IN THE INTEREST OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2359 EDA 2024 |

Appeal from the Order Entered August 2, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No: CP-64-DP-0000033-2022

IN THE INTEREST OF: L.B., A MINOR  :  IN THE SUPERIOR COURT OF
  :  PENNSYLVANIA
  :
APPEAL OF: A.L.H., MOTHER  :
  :
  :
  :
  :
  :
  :
  :  No. 2360 EDA 2024

Appeal from the Decree Entered July 30, 2024
In the Court of Common Pleas of Wayne County
Civil Division at No: 2024-00010

BEFORE: STABILE, J., NICHOLS, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.: **FILED APRIL 21, 2025**

A.L.H. ("Mother") appeals from the July 30, 2024, decrees that involuntarily terminated her parental rights to her son, A.B., Jr., born in September of 2019, and daughter, L.B., born in January of 2022 (collectively, "the Children").[1] Mother also appeals from the August 2, 2024 orders that changed the Children's permanency goals from reunification to adoption. After careful review, we affirm the involuntary termination decrees and dismiss the appeal from the goal change orders as moot.

The certified record reveals the following relevant facts and procedural history. This family came to the attention of Wayne County Children and

---

[1] The parental rights of A.M.B., the Children's father ("Father") (collectively with Mother, "Parents"), were also involuntarily terminated by the same decrees. Father separately appealed the involuntary termination decrees and goal change orders at 2353-56 EDA 2024, which we address in a separate memorandum.

- 2 -

Youth Services ("CYS" or "the Agency") after the Agency received a report in approximately November of 2022, alleging that, *inter alia*, Parents used methamphetamines in the family home.  It was further alleged that Father then kicked Mother out of the home.  Upon investigation, Parents each admitted to methamphetamine use.  The Agency implemented an out-of-home safety plan wherein the Children were placed with a maternal aunt.  On December 6, 2022, Parents entered into a voluntary agreement with CYS for the placement of the Children with a foster care family.

On January 4, 2023, the court adjudicated the Children dependent.  Thereafter, the court established the Children's respective permanency goals as reunification.  In furtherance of this goal, Mother was ordered to, *inter alia*, follow drug and alcohol treatment recommendations and obtain stable housing.[2]

The court placed the Children with a new kinship resource on January 7, 2023.  On May 27, 2023, the Children were moved to their fourth placement with pre-adoptive foster parents, M.M. and A.M. ("Foster Parents"), where they remained at the time of the subject proceedings.

The record does not reveal whether Mother completed drug and alcohol treatment.  Over the course of the dependencies, Mother had multiple drug

---

[2] We note that Mother was not explicitly ordered to complete a drug and alcohol evaluation for reasons not divulged in the record, although she was ordered to follow treatment recommendations.

screens that produced an "unusually dilute" result, which were to be interpreted with "caution[.]" CYS Exhibit 1 at 7-8; N.T., 7/23/24, at 50-51.

Mother's housing situation varied over the course of the proceedings. Mother lived in a room in a shared residence with roommates in Wayne County from November of 2022 to May of 2024, which was deemed inappropriate for reunification due to concerns about Mother's roommates. *See* CYS Exhibit 1 at 7-8; N.T., 7/23/24, at 48. Sometime after Father became incarcerated in April of 2024, Mother moved into his apartment in Lackawanna County. *See* CYS Exhibit 1 at 8; N.T., 7/23/24, at 19-20, 23. Following conversations with Mother, CYS had concerns about her ability to maintain this housing without assistance from Father, who she reported was providing half of the rental funds but did not live there. *See* CYS Exhibit 1 at 8-9; N.T., 7/23/24, at 19-20, 30, 39.

On April 23, 2024, CYS filed petitions that included, *inter alia*, a request to change the Children's permanency goals from reunification to adoption. Two days later, on April 25, 2024, the Agency filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (b). The orphans' court held a combined evidentiary hearing on the petitions on July 23, 2024. At the time of these proceedings, the Children, then four and two years old, respectively, had been in CYS custody for twenty-two months. The Children were represented by

their court-appointed guardian *ad litem* ("GAL"), Lindsay Collins, Esquire.[3]

Mother was present, represented by counsel, and did not testify.    CYS

_____

[3] Our Supreme Court has mandated that this Court conduct *sua sponte* review to ensure that orphans' courts have properly appointed counsel to represent the legal interests of children in contested termination proceedings in conformity with 23 Pa.C.S.A. § 2313(a).  ***See In re Adoption of K.M.G.***, 240 A.3d 1218, 1234-36 (Pa. 2020).  When counsel is appointed to serve as both a child's legal interest counsel and GAL, this Court must also *sua sponte* review whether "the orphans' court determined that the child's best interests and legal interests did not conflict."  ***Id.*** at 1236.  It is well-established "that a single attorney cannot represent a child's best interests and legal interests if those interests conflict."  ***Id.*** (citing ***In re T.S.***, 192 A.3d 1080, 1082 (Pa. 2018).

Our review of the certified record in the instant appeals reveals that the orphans' court did not issue a separate order appointing the GAL to the dual representation of the Children's best and legal interests in the termination proceeding.  Consequently, no conflict determination was made.

We emphasize that our Supreme Court has placed the onus squarely and solely upon the orphans' courts to make these conflict determinations.  ***See K.M.G.***, 240 A.3d at 1236.  These findings must typically be conducted **before** counsel's appointment and should appear within the orders appointing counsel.  ***See id.*** (noting that our inquiry concerning a conflict finding "can be addressed by a review of the orphans' court order (or lack thereof) appointing counsel").

Our Supreme Court has explicitly forbidden *sua sponte* appellate review of the factual inquiry of whether the record shows that an attorney appointed to the dual role "had a conflict in representing both a child's legal interests and best interests."  ***Id.***  Accordingly, this Court remanded to the orphans' court with instructions for it to issue a definitive finding concerning any potential conflict in the Children's legal and best interests.  ***See*** Remand Order, 2/26/25, at 3-5.  In its response, the orphans' court affirmed that no conflict existed between the Children's best and legal interests.  ***See*** Supplemental Statement of Reasons, 3/5/25, at 1.  Thus, we find no structural error.

presented the testimony of its caseworker Brianna Clark and proffered two exhibits, which the court admitted without objection.[4]

By decrees dated and entered July 30, 2024, the orphans' court involuntarily terminated both Mother's and Father's parental rights to the Children. In addition, pursuant to the orders dated July 30, 2024, and entered on August 2, 2024, the court changed the Children's permanency goals from reunification to adoption.

Mother timely filed separate notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on September 18, 2024, which directed this Court to its July 30, 2024 opinion, which accompanied the subject decrees and orders. On October 2, 2024, this Court *sua sponte* consolidated Mother's multiple appeals pursuant to Pa.R.A.P. 513.

Mother presents the following issues for our review on appeal:

1. Whether the [orphans'] court erred in concluding that [] Mother lacked the essential parental care, control, and substance necessary to provide the minor child with the essential parental care?

2. Whether the [orphans'] court erred as a matter of law in determining that the [termination of] parental rights of [] [M]other [] was warranted?

3. Whether the [orphans'] court erred as a matter of law in determining that the termination of parental rights of [] [M]other

_____

[4] Father testified on his own behalf.

[] would serve the developmental, physical[,] and emotional needs and welfare of the minor child?

4. Whether the [orphans'] court erred as a matter of law in determining that a permanency goal change was warranted in that the current placement goal was no longer appropriate or feasible?

Mother's Brief at 6.[5, 6] We will begin by addressing Mother's first three claims concerning the orphans' court's termination decrees.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and

_____

[5] We have reordered Mother's issues for ease of disposition.

[6] We note with displeasure that the Children's GAL did not participate in the instant appeal. The GAL advocated for termination of Parents' parental rights at the conclusion of the hearing. *See* N.T., 7/23/24, at 74-76.

permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *See id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). For the reasons discussed *infra*, we conclude that the

certified record supports the termination decrees pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (b), which provide as follows:[7, 8]

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[7] Pursuant to this Court's February 26, 2024 remand order, noted *supra*, the orphans' court additionally filed a supplemental Rule 1925(a) opinion clarifying that it terminated Mother's parental rights under Sections 2511(a)(2) and (5). *See* Supplemental Statement of Reasons, 3/5/25, at 1-5.

[8] Given our disposition as to Section 2511(a)(5), we need not review, and further make no conclusions as to, the orphans' court's findings pursuant to Section 2511(a)(2). *See B.L.W.*, 843 A.2d at 384.

23 Pa.C.S.A. § 2511(a)(5), (b).

In order to satisfy the requirements of Section 2511(a)(5), the petitioning party must produce clear and convincing evidence to establish: (1) the child has been removed from parental care for at least six months; (2) the conditions that lead to the child's removal or placement continue to exist; (3) the parent(s) cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parent(s) are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. *See In re B.C.*, 36 A.3d 601, 607 (Pa. Super. 2012).

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children

involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (internal citations, quotations, and footnotes omitted).

The Court further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Id.* at 1109. The "severance of a necessary and beneficial relationship [is] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-10. Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839. Further, this Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *Id*. Thus, we will not disturb such an

assessment if the orphans' court's factual findings are supported by the record. *See id.*

We begin with Mother's first and second issues, wherein she challenges the sufficiency of the evidence as to Section 2511(a). *See* Mother's Brief at 12-16, 21-23. Specifically, Mother argues that because she consistently complied with her goals, consistently attended visitation, and had a "strong bond" with the Children, that the conditions which led to the removal of the Children no longer existed at the time of the termination hearing. *Id.* at 23. She repeatedly highlights her evident "willingness" to remedy the conditions and dismisses evidence of her inability to maintain appropriate housing as speculative. *Id.* at 13-16. Mother contends that the record contained no evidence of how termination would serve the Children's best interests. *See id.* at 24. We disagree.

The record amply demonstrates that Mother has not overcome her illegal substance use and her inappropriate housing, which caused the Children's removal from her care. As to the Agency's initial involvement with the family, Ms. Clark testified that Mother left the Children in the home while Father was using methamphetamines and admitted to her own use of the same illegal drug. *See* N.T., 7/23/24, at 5-6. The certified record is devoid of evidence that Mother completed any type of drug and alcohol treatment over the course of the Children's dependencies. Ms. Clark stated that Mother

was not receiving drug and alcohol treatment at the time of the termination proceeding. *See id.* at 44.

In addition to not receiving any drug treatment, Mother tested positive for methamphetamines in April of 2024. *See* N.T., 7/23/24, at 10, 19, 32; CYS Exhibit 1 at 7. Mother argues that this was her only positive screen but fails to recognize the fact that this positive screen was only two months before the subject hearing. Significantly, Mother's counsel stipulated to the drug screens that produced "unusually dilute" results, which occurred on four of the thirteen screens from the current review period, and additional times over the course of the Children's dependencies. N.T., 7/23/24, at 50-51; CYS Exhibit 1 at 7-8; *see generally* Dependency Dockets. These results are specifically recommended to be interpreted with "caution" when showing negative for substances. CYS Exhibit 1 at 7-8.

Further, Ms. Clark testified that Mother's drug screens were consistently positive for marijuana, for which Mother had a valid prescription. *See* N.T., 7/23/24, at 18-19, 32, 42; CYS Exhibit 1 at 7-8. However, Ms. Clark testified to the following concerns surrounding Mother's marijuana use:

Q: Does the Agency have any concerns with her THC use?

A: There have been concerns for where she is getting her THC as [Mother] has stated to the [A]gency [that] she did not know that she could not get her THC off of the streets with her medical marijuana card.

Q: Are there concerns for any other substances other than THC?

> A: There was a concern for methamphetamine use in April of 2024.
>
> Q: [D]id the [A]gency ask her about her methamphetamine use?
>
> A: Yes.
>
> Q: And what was her response?
>
> A: She stated that she had not used and she further explained that it may have been from THC that she purchased from a sketchy gas station in Scranton.

N.T., 7/23/24, at 19. Ms. Clark stated that Mother has provided a single receipt from a dispensary to show the source of her marijuana. *See id.* at 33. As such, the Agency continued to have concerns that Mother obtained her marijuana through illegal methods and potentially in conjunction with other illegal substances, as Mother alleged, considering she consistently used marijuana and tested positive for it on the morning of the subject hearing. *See id.* at 18-19, 32, 42.

Additionally, Ms. Clark testified that inappropriate housing was also a cause of the Children's removal. *See id.* at 7. Ms. Clark stated that Mother's main residence for the near entirety of the Children's dependencies, a room in a shared house, was inappropriate for reunification because Mother reported that she was sexually assaulted by her roommate. *See id.* at 48; CYS Exhibit 1 at 8. The Agency's documentation showed that Mother reported feeling unsafe in the home and that the roommate who sexually assaulted her abused alcohol. *See* CYS Exhibit 1 at 8. Mother was ineligible for "Section 8 due to recent criminal history and unpaid fines." *Id.* The Agency would have

- 14 -

assisted Mother with rent "if she could demonstrate the ability to pay the rent. This never happened." **Id.**

The record revealed that Mother moved into Father's apartment sometime after he was incarcerated in April of 2024, but the Agency could never confirm if the landlord knew she was there because Mother "revoked the release for the [A]gency to communicate with the landlord[.]" CYS Exhibit 1 at 8; N.T., 7/23/24, at 19-20, 23. Mother reported to CYS that she was not on the lease, which mirrors Ms. Clark's testimony that only Father is on the lease. **See** CYS Exhibit 1 at 8; N.T., 7/23/24, at 41-42. Ms. Clark testified that Mother told the Agency she has not paid rent, did not know how to pay rent or when it was due, and could not afford it without Father's contribution. **See** N.T., 7/23/24, at 20, 30, 39; CYS Exhibit 1 at 8-9. This uncontested testimony as to Mother's admissions belie her contention that the orphans' court's concerns are speculative.

Further, Mother reported to CYS that Father was not living with her in the apartment, but Father testified that he has been living there with her since he was released from jail. **See** N.T., 7/23/24, at 20, 23, 52-54. In light of the incident that brought the Children into care, particularly Parents' shared illegal substance use and Father kicking Mother out of their home, the Agency had concerns about Parents living together. **See id.** at 47, 57. Mother also repeatedly made recent statements to CYS that she did not feel safe living with Father. **See id.** at 24, 36, 40. The Agency was unaware that Parents

were residing together until the testimony at the subject hearing. ***See id.*** at 40. Mother's "back up" housing resource was a homeless shelter. ***Id.*** at 20.

The foregoing evidence clearly confirms that the conditions of the Children's removal, namely Mother's illegal substance use and inappropriate housing, continued to exist at the time of the termination proceeding. Therefore, the record unequivocally supports the orphans' court's finding that the conditions which led to the Children's removal from Mother's care continued to exist.

With respect to Mother's assertion that the record is devoid of evidence that termination would best serve the Children's needs and welfare, we conclude that the record evidence supports the orphans' court's findings. The record reveals that, since Parents agreed to the out-of-home safety plan, the Children had been moved through three different placements before their current pre-adoptive home due to Mother's inability to achieve reunification. Ms. Clark testified that Mother has not made the type of substantial progress that "would see the [C]hildren safely and imminently returned" to her care within the three months following the combined hearing. N.T., 7/23/24, at 26. Indeed, the record confirms that the Children could not be safely returned to Mother's care inasmuch as she did not have the requisite level of compliance and progress concerning the successful resolution of the above-discussed conditions that caused the placement of the Children. ***See*** N.T., 7/23/24, at

5-7, 10, 18-20, 23-24, 30, 32-33, 36, 39, 40-42, 44, 47-48, 50-54, 57; CYS Exhibit 1 at 7-9.

Therefore, the orphans' court's finding that termination of Mother's parental rights best served the Children's needs and welfare is supported by the record. Accordingly, we discern no abuse of discretion or error of law in the orphans' court finding that Mother's conduct warranted termination pursuant to Section 2511(a)(5).

Mother's third issue, her challenge to Section 2511(b), contends that CYS did not meet their evidentiary burden as to this subsection. *See* Mother's Brief at 24-25. Mother argues that the record contains no evidence of the parent-child bond or the intangibles as required by the Section 2511(b) analysis. *See id.* Further, she claims that the court "failed to appropriately address the bonding issue." *Id.* at 25. Mother's arguments lack factual merit and consequently fail.

The orphans' court found the following in regard to Section 2511(b):

For the last twelve [] months, the [] [C]hildren have been in a pre-adoptive placement with [Foster Parents.] . . . Mother attended [ninety-six percent] of visits offered with [the Children.] However, Mother's visitation has gone back and forth between supervised, monitored, and unsupervised. Ms. Clark did testify that a bond exists between Mother and the [] [C]hildren, but the [A]gency believes it is in the [C]hildren's best interests to have that bond severed.

. . .

The [c]ourt finds that termination of . . . Mother's . . . parental rights would be in the best interests of [the Children] because doing so would best serve their developmental, physical[,] and emotional needs and welfare. In addition, [the Children] have

been safe and provided for while in the care of [Foster Parents], whom []CYS has identified as a pre-adoptive resource. This [c]ourt . . . finds that termination is in the best interests of [the Children] under 23 Pa.C.S.A. § 2511(b).

Orphans' Court Opinion, 7/30/24, at 9-11 (citation omitted).

The orphans' court's findings are fully supported by the record evidence. Mother's visitation fluctuated between supervised and unsupervised due to concerns such as Mother's positive methamphetamine test and potential "coaching" of A.J., Jr. during her visits.[9, 10]  N.T., 7/23/24, at 9-10; CYS Exhibit 1 at 3.  Ms. Clark testified that Mother attended one hundred nineteen of one hundred twenty-four offered visits, which were positive and generally went well, with the exception of the aforementioned coaching by Mother.  *See* N.T., 7/23/24, at 9-10, 31.  Ms. Clark specifically testified that there was a bond between the Children and Mother, but she believed that it was in the Children's best interests that the bond be severed, and this decision included consideration for the Children's needs and welfare.  *See* N.T., 7/23/24, at 10-11; CYS Exhibit 1 at 3.  Evidence of positive supervised visitation, in and of itself, is not adequate for the orphans' court to find that the bond between

_____

[9] The certified record provides no further information regarding the timeline of the supervision changes or locations of Mother's visitation.

[10] Ms. Clark attested, which the documentation confirmed, that the concern arose from A.J., Jr., "saying that he was going to live with mommy and daddy and do things together."  *Id.* at 31; CYS Exhibit 1 at 3.  The Agency had no reports of A.J., Jr. making these types of comments before the subject visit with Mother.  *See* CYS Exhibit 1 at 3.

Mother and the Children was sufficiently "necessary and beneficial," as to preclude the termination of her parental rights. *K.T.*, 296 A.3d at 1109-10. Additionally, Ms. Clark testified that the Children were "comfortable" and "doing very well" in their pre-adoptive home with Foster Parents, with whom they had been placed with for over twelve months. N.T., 7/23/24, at 7, 26-27. Ms. Clark stated that the Children are bonded to Foster Parents. *See id.* at 27.

Contrary to Mother's bald claims, the record contains the sufficient, foregoing evidence of the parent-child bond and other intangibles pursuant to this subsection. The orphans' court indeed analyzed the bond, as well as the relevant intangibles, as demonstrated by the above excerpt from its opinion. We reiterate that the extent of the bond analysis "necessarily depends on the circumstances of the particular case." *J.M.*, 991 A.2d at 324. As the Children had been in CYS care for twenty-two months at the time of the hearing, the orphans' court was well within its discretion to prioritize the Children's safety and security over their bond with Mother. *M.E.*, 283 A.3d at 839. Accordingly, we discern no error or abuse of discretion in the orphans' court's conclusion that the Agency met its evidentiary burden pursuant to Section 2511(b).

We now turn to Mother's final issue, which challenges the sufficiency of the evidence to change the Children's permanency goals from reunification to adoption. *See* Mother's Brief at 17-21. Given our disposition concerning

termination, Mother's remaining claim concerning her appeal from the goal change orders is moot. *See Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (finding issues regarding goal change moot in light of affirming the termination of parental rights). Accordingly, we dismiss Mother's appeal from the orders which changed the Children's permanency goals to adoption as moot. *See id.*[11]

Thus, we affirm the decrees with respect to the involuntarily termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (b). We dismiss the appeal from the goal change orders as moot.

Decrees affirmed. Appeal from goal change orders dismissed as moot.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/21/2025

---

[11] Even if not moot, for the reasons we have already discussed throughout this memorandum with respect to termination, the record confirms that changing the Children's respective permanency goals to adoption is in their best interest. *See In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011)).Appe